# STONE v. UNION PACIFIC RAILROAD COMPANY.

### No. 813. Decided April 11, 1907 (89 Pac. 715).

1. APPEARANCE — JURISDICTION OF THE PERSON. Where, in an action for the death of plaintiff's intestate against a railroad company, defendant filed a general demurrer for want of facts, and thereafter stipulated to enter its appearance in the cause and filed its answer to the merits, the court acquired jurisdiction of its person.

2. COURTS — JURISDICTION — PRIVILEGE — WAIVER. Laws 1903, p. 76, c. 92, providing that a transitory cause of action arising without the state in favor of a nonresident shall be brought in the county where the principal defendant resides, or, if the principal defendant is a corporation, in the county where the corporation has its principal place of business, and further providing that, if the cause of action be in favor of a resident, then the action to be brought in the county where the principal defendant resides, or if the principal defendant is a corporation, in the county where such resident resides, or in the county where the corpora-

tion has its principal place of business, does not go to the juris-
diction of the subject-matter, but confers a privilege on defendant
merely which he may waive.[1]

3. DEATH — ACTION — JURISDICTION. Laws 1903, p. 76, c. 92, pro-
vides that a transitory cause of action arising without the state
in favor of a resident against a corporation shall be brought in the
county where such resident resides, or· in the county where the
corporation has its principal place of business. The statute of
Wyoming giving a right· of action for the wrongful death of a
person provides that the action shall be brought by and in the
name of the personal representative of the decedent. *Held*, that
the court had jurisdiction· of the subject-matter of an action brought
by a resident administrator in the county where he resided for
the death of his intestate caused by defendant's alleged negligence
in Wyoming.[2]

4. EVIDENCE — SIMILAR FACTS AND TRANSACTIONS — EXPERIMENTS.
Evidence that steam escaping from an engine, at a time other than
that of the accident, so obscured the engineer's view of the track
that it was necessary for him to go on to the pilot in front of the
engine to see the track in advance, was not subject to the objection
that it was stating the result of an experiment requiring a simi-
larity of conditions to be first shown.

5. SAME — OPINION EVIDENCE — INVASION OF PROVINCE OF JURY.
On the issue as to whether steam escaped from an engine to such
an extent that it obscured the tracks so that the engineer could
not see ahead, and so that its headlight could not be seen by those
approaching it, evidence of an engineer who had driven the engine
on the morning of the accident as to the effect of the steam escap-,
ing from the engine in obscuring a view of the track, and as to'
whether the track could be seen because of the escaping steam,
was not subject to the objection that it called for an opinion on
a subject as to which the jury were equally competent to judge.

6. MASTER AND SERVANT — INJURY TO SERVANT — RELEASE — VALI-
DITY. A release by an employee of an express company who was
also an employee of defendant railroad company executed to the
express company, whereby the employee released the defendant
from all liability for all acts of negligence which might in any
wise cause injury to him or death, while engaged in his employ-
ment, was as to the railroad company void, as against public policy.

7. SAME. Const. Wyo. article 10, section 4, provides that any con-
tract or agreement with any employee waiving any right to re-
cover damages for causing death or injury of any employee shall

1 Farnsworth v. U. P. Coal Co. (Utah), 89 Pac. 74.
2 Thorpe v. U. P. Coal Co., 24 Utah 475, 68 Pac. 145. In re Low-
ham (Utah), 85 Pac. 445.

be void. Article 19, section 1, provides that it shall be unlawful for any corporation to require of an employee any contract whereby the corporation shall be released from liability on account of personal injuries received by the employee by reason of the negligence of the corporation or the employees thereof, and that such contracts shall be void. *Held,* that it having been contemplated at the time plaintiff's intestate executed in this state a release of liability to an express company of both itself and defendant railroad company by both of whom the intestate was employed that part of his services was to be performed in Wyoming, and the injuries having been inflicted while intestate was engaged in the performance of those services in Wyoming, the release was to be deemed a contract of that state, and as such was void.

8. SAME — PROXIMATE CAUSE OF INJURY — CONCURRING CAUSES. Where the negligence of an employer and that of a fellow servant concur to produce an injury to an employee, the employer is liable for the injury sustained.3

9. SAME — INJURIES TO RAILWAY EMPLOYEE — EVIDENCE — SUFFICIENCY. Evidence *held* sufficient to authorize a finding that defendant railroad company was negligent in using a certain engine.

10. NEGLIGENCE — PROXIMATE CAUSE OF INJURY — NATURAL CONSEQUENCES. Where an act is one which a person in the exercise of ordinary care could have anticipated as likely to result in injury, then he is liable for any injury actually resulting from it, although he could not have anticipated the particular injury which did occur.

11. MASTER AND SERVANT — INJURY TO RAILWAY EMPLOYEE — QUESTION FOR JURY. Under the evidence, *held,* that it was a question for the jury whether the proximate cause of a railway employee's injury resulting in death was the negligence of the railway company in using a defective engine.4

APPEAL from District Court, Second District; J. A. Howell Judge.

Action by A. I. Stone, administrator of the estate of Jas. H. Winslow, deceased, against the Union Pacific Railroad Company. From a judgment for plaintiff, defendant appeals.

3 Jenkins v. Mining Co., 24 Utah 513, 68 Pac. 845; Merrill v. O. S. L. R. R., 29 Utah 264, 81 Pac. 85, 110 Am. St. Rep. 695.

4 Wright v. Railroad, 14 Utah 394, 46 Pac. 374; Ewell v. Mining Co., 23 Utah 192, 64 Pac. 367; Thompson v. Salt Lake Rapid Transit Co., 52 Pac. 92, 16 Utah 281, 40 L. R. A. 172, 67 Am. St. Rep. 621.

AFFIRMED.

*P. L. Williams, Geo. H. Smith, Jno. G. Willis,* and *C. R. Hollingsworth* for appellant.

*Maginnis & Corn* for respondent.

### APPELLANT'S POINTS.

In *Patton v. Railroad,* 179 U. S. 658, the court speaking of proximate cause, said; "Where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the empolyer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs." (*Sutherland v. Railroad,* 125 N. Y. 737; *Sharter v. Railroad,* 121 Ala. 158, 25 So. 853; *Gleason v. Railroad,* 73 Fed. 647; *Railroad v. Poirier,* 167 U. S. 48; *Railroad v. Barry,* 84 Fed. 944; *Bryant v. Railroad,* 81 Hun 164; *Smithson v. Railroad,* 71 Minn. 216, 73 N. W. 853; *Railroad v. Doyle,* 60 Miss. 977; *Hoover v. Railroad,* 191 Pa. 146, 43 Atl. 74; *Vizelich v. Railroad,* 126 Cal. 587; *Railroad v. Wooley,* 77 Miss. 927, 28 So. 26; *Railroad v. Henderson,* 134 Ind. 636, 33 N. E. 1021; *Burns v. Coal Co.,* 27 W. Va. 285, 55 Am. 304.)

### RESPONDENT'S POINTS.

The action is provided for by section 3449, Revised Statutes Wyoming, 1899, which requires: "Every such action shall be brought by and in the name of the personal representative of such deceased person."

This court has held that such action when brought in Utah must be brought by the personal representative. (*Thorpe v. Coal Co.,* 24 Utah 475. In re Loham, 85 Pac. 445; *Utah Sav. & Trust Co. v. Diamond,* 73 Pac. 524.)

The action therefore in Wyoming and in Utah is one created by the statute in favor of the personal representative and he being the proper plaintiff it may be brought at his place of residence. It is the cause of action that is the test, not the fruits of the action, and the cause of action is given to him. This identical question was before the Circuit Court of Appeals and thoroughly reasoned out in *Railroad v. Thiebaud,* 52 C. C. A. 538, 114 Fed. 918; *Railroad v. Smith,* 85 S. W. 1173.

The guardian and not the ward is the party whose citizenship governs where the guardian has the right to sue in his own name. (*Railroad v. Eckman,* 187 U. S. 429.)

As pointed out in that case—which makes the distinction —he is not a mere figurehead or nominal party, but is an interested party. (*Rice v. Houston,* 13 Wall. 66.)

So also, the citizenship of an administrator and not that of his beneficiary governs. (*Harper v. Railroad,* 36 Fed. 102; *Goff v. Railroad,* 36 Fed. 299; *Miller v. Sands,* 44 N. W. 301; *Bishop v. Railroad,* 117 Fed. 771; *Wilson v. Lumber Co.,* 103 Fed. 801; *Popp v. Railroad,* 96 Fed. 465; *Bank v. Fitzgerald,* 94 Fed. 16; *Bangs v. Loveridge,* 60 Fed. 963; *DeForest v. Thompson,* 40 Fed. 375.)

The same rule is held to apply to a trustee. (*Mass. Co. v. Twp.,* 115 U. S. 283; *Dodge v. Tulleys,* 114 U. S. 451; *Railroad v. Blatchford,* 11 Wall. 172; *Pepper v. Fordyce,* 119 U. S. 469; *Pennington v. Smith,* 78 Fed. 399; *Griswold v. Bacheller,* 75 Fed. 470; *Ship v. Williams,* 62 Fed. 4; *Rush v. Brittle,* 58 Fed. 611; *Morris v. Lindauer,* 54 Fed. 23.)

"The defendant may appear specially to object to the jurisdiction of the court, and if, by motion or other form of application to the court, he seeks to bring its powers into action, except on the question of jurisdiction, he will be deemed to have appeared generally." (*Cropsey v. Wiggenhorn,* 3 Neb.

108; *Schaefer v. Waldo,* 7 O. St. 309; *Elmer v. Hiatt,* 4 G. Greene [Ia.], 439; *Schell v. Leland,* 44 Mo. 289; *Lamphey v. Beavers,* 25 Ala. 535; *Abbott v. Semple,* 25 Ill. 107.)

STRAUP, J.

1.   This action was brought in the county of Weber, state of Utah, by the plaintiff, for negligently causing the death of his intestate, James H. Winslow, near Azusa, in the state of Wyoming.   It is alleged in the complaint, and admitted in the answer:   That the defendant is a corporation organized under the laws of the state of Utah, and was operating a railroad between Ogden City, Utah, and Omaha, Neb. That at the time of the accident the deceased was in the employ of the Pacific Express Company as an express messenger, and while being transported on one of the cars of the defendant from Green River, Wyo., to Ogden City, he was also in the employ of the defendant, rendering services for it in the handling of and caring for baggage of passengers carried and transported by the defendant.   The deceased was on a passenger train designated as No. 3 running west from Green River.   That train collided with a freight train designated as "No. 1661," running east from Evanston, Wyo.   The alleged acts of negligence submitted to the jury were that the train dispatcher at Evanston sent a telegraphic order to Granger, a station between Evanston and Green River, to the effect that No. 3 would run one hour and thirty minutes late; that the receiving operator in writing said message for delivery to the engineer and conductor of the freight train transcribed the same so as to read that No. 3 would run one hour and fifty minutes late, and, when so transcribed, delivered the message to the engineer and conductor of the freight train, and that they, relying upon such order and direction, and believing that there was ample time in which to run their train so as to meet and pass No. 3 at Azusa, started to make the run; and that by reason of the false information contained in the telegram, together with other acts of negligence, the collision occurred.   It was further alleged that the defendant negligently sent out an engine which was attached to and propelled

the freight train, in that the engine was so defective and out of order that it leaked steam so badly as to envelop the engine with steam, and so obscured the view of the engineer and fireman on the freight train that they could not see the track and objects ahead of the engine, and so obscured the headlight of the engine of the freight train that it could not be seen by those on an approaching train. The defendant denied the alleged acts of negligence, and pleaded that the collision and the death of the deceased were due to the negligence of fellow servants; alleged the assumption of risk and lack of jurisdiction of the court to try the cause; and further pleaded a general written release entered into between the deceased and the Pacific Express Company, by the terms of which the deceased agreed with the express company and the defendant that neither should be liable to the deceased, his heirs, executors, administrators, or assigns for any act of negligence, either of the express company or of any other carrier employed by the express company, including the defendant, and that the deceased, by the terms of said contract, had released the defendant from any and all liability for any and all acts of negligence which might in any wise cause, or relate to, any damage, injury, or death which might result to the deceased while engaged in his employment.

2.   The evidence shows that the freight train started east from Evanston at about 5:25 p. m., on November 11, 1904. Steam in large quantities escaped from the valve stems and piston heads of the engine propelling the freight train, so as to completely envelop it and obscure the headlight, thereby preventing persons on the engine from seeing the track in advance of the engine, or its headlight by those on an approaching train.   A Mr. Lowham, a witness for the plaintiff, testified that he was locomotive engineer; that he had been in the employ of the defendant for about sixteen years; that he had operated the engine in question for several months prior to the accident; and that the last time that he ran the engine was on the 9th day of November, at which time he made a round trip with it between Evanston and Green River.   After describing the cylinders and valve chambers of and their posi-

tion on the engine, and otherwise describing the different parts and character of the engine, he was asked by plaintiff's counsel: "Q. On that occasion [referring to the trip November 9th] I will ask you whether you noticed, or had occasion to notice, whether steam was escaping from the cylinder on that engine or not?" This was objected to as being irrelevant, incompetent, and immaterial. The objection being overruled, the witness answered: "A. Yes; the steam was escaping— escaping bad—from the front cylinder heads. There was some from the pistons, and the valve stems blew bad too. Q. What, if anything, especially called your attention to it on that trip? A. Why, I couldn't see the track ahead of the engine, and I would have to go out on the front of the engine and ride on the pilot in order to see the track ahead of the engine. Q. Did you do that? A. I did do it. Q. How did it happen that you did that? (Objected to as irrelevant, incompetent, and immaterial.) A. I thought there was a train ahead of me going up Peru hill that night, and I couldn't see whether there was or not, and didn't like to shut the engine off, so I went out on the pilot to find out where they was. After I had been out there long enough to satisfy myself where they was, I went back and staid until we got on top of the hill. Q. Had you noticed that condition of affairs before that on that same engine? (Objected to as incompetent, irrelevant, and immaterial.) A. Yes; all the while I ran the engine. Q. Was it a continual thing? A. It was a continual thing." The witness further stated that there was a workbook in the roundhouse, and a regular form to be filled out for the reporting of defects and repairs needed on engines, that he reported that engine six or seven times previous to the accident, and that on the 9th day of November he went to the roundhouse foreman who had charge of making repairs on locomotives, and further reported it directly to him. "Q. I will ask you what report you made to him; what did you say to him? (Objected to as incompetent, irrelevant, and immaterial.) A. I just told him the condition the engine was in, that she was blowing bad, and I couldn't see the track, and she ought to be fixed, ought to be kept in. He said she was

going over the road, and they had engines that were not doing as well as she was: she would have to go on; that he wouldn't do the work—couldn't do the work. Q. What, if anything, further did you say to him? (Same objection.) A. I said you will leave that engine out until she gets me discharged, or gets some one hurt. It was impossible for me to know where I was going with her, on account of not being able to see the track." Another witness, a Mr. Hammerson, a lomotive engineer who had been in the employ of the defendant, testified that he last ran the engine on the morning of November 11th, the day of the accident; that he had made a round trip from Evanston to Green River, and returned to Evanston some time in the morning of that day. After testifying that he knew the general condition of the engine, he was asked: "Q. You may state the condition of the engine relative to steam escaping from the cylinder heads and piston? (Objected to as incompetent, irrelevant, and immaterial.) A. She was leaking steam pretty bad from the valve stem going up the hill into Evanston. Q. What is the effect of this leakage of steam as to being able to see the track in front of the engine as she traveled along? (Same objection.) A. The condition of weather at that time being cold, the steam would hang very heavy upon the engine. Of course, there wouldn't be any steam around her standing still, because you wouldn't be working any steam, but while you were working steam, especially on a grade of any kind, the steam was very dense during cold weather. The steam was leaking about *thirty-four inches* from the front end of the boiler head. This would obscure the view of the people riding in the cab, unless there was a very strong current of wind or something to carry it away sideways. Q. What was the effect on this particular engine, on this particular day, you running it? Could you see the track in front of you? (Same objection.) A. It was very dense coming up the hill there. I remember she was blowing very bad coming up the hill at that time. I couldn't see, without a current of air blows it from the right side to the left side, but, if steam was coming up there, it kind of obscures

32 Utah—13

the view at the front end of the engine. Q. Regarding the ability to distinguish the track ahead of you, to what extent was your view obscured by this escaping steam as to seeing objects ahead of you? (Same objection.) Q. Would it have been possible to distinguish objects ahead of you in view of this escaping steam? (Same objection.) A. Well, I don't recall anything calling my attention at that time to that particular thing. I knew the engine was blowing, but I didn't have anything to attract my attention to look very far ahead. May have been a breeze blowing, so I didn't get the full benefit of the steam." Other witnesses, railroad employees of the defendant, testified that on the night in question they saw the engine as it was being propelled along the line, some at about 6 o'clock, others at 8 o'clock, others later, and that the engine leaked steam to the extent that the engine could not be seen as it approached. One of them described it as follows: "The first thing I saw of her was a bank of steam. I could not tell what it was. The engine kept coming towards us for 150 feet, and then stopped. I called the engineer over to my side of the engine, and after that I walked down to where she was. I found engine 1661 was leaking steam from her cylinder heads. The steam was all escaping from her. When she started up, I could hear it escape from the piston and the valve stems, but I could not see on account of escaping steam. I could not see any part of the front of the engine until three or four minutes after she stopped. The headlight was burning." Others testified that as the engine came along it leaked steam so badly that they could only see the top of the pilot and about six inches of the smokestack.

The distance from Evanston to Granger is about seventy miles, with about fourteen stations intervening, from four to seven miles apart. The freight train left Evanston at about 5:25 p. m. The distance from Green River to Granger is about thirty miles, with six stations intervening, from 3 1-2 to 7 1-2 miles apart. The freight train was running east and the passenger train west. Azusa is six miles east of Granger. The collision occurred about one mile west of Azusa. The passenger train was a train of a superior class to

that of the freight train, and had the right of way. The
freight train did not run on regular time, but traveled en-
tirely upon telgraphic orders. At Altamont, a station about
13 1-2 miles east of Evanston, the crew of the freight train,
at about 8:05 p. m., received from the telegraph operator a
train order, numbered 59, regarding the movements of the
passenger train, which read: "No. 3 will run one hour and
thirty minutes late Green River to Evanston." The freight
train left Altamont at 8:25 and arrived at Granger at 11:25
p. m. When the freight train reached Granger, the orders
theretofore given to the train crew ended. They could not
proceed with their train without new orders. Their train in
effect became a new train from Granger. At Granger they
received order No. 66 at 11:35 p. m., which read: "Engine
1661 will run extra Granger to Green River ahead of Nos.
18 and twenty-four and has right over Nos. 19 and 25 Gran-
ger to Peru." At the same time and place they also received
a train order No. 59, which read: "No. 3 will run one hour
fifty minutes late Granger to Green River." The time-tables,
possessed by all train crews, showed that No. 3 was regularly
due at Azusa, six miles east of Granger, at 10:12 p. m. An
hour and fifty minutes late would make that train due at
Azusa at 12:02. The freight train left Granger for Azusa
at 11:40. From Granger to Azusa was downgrade until a
short distance from the latter place. The track was straight,
and there was an unobstructed view between the two places.
The night was clear and cold. A rule of the defendant pro-
vided that at meeting points between trains of different classes
the inferior train must make the station and clear the superior
train at least ten minutes. The freight train was authorized
to run at a speed of thirty miles an hour. Had the last train
order, No. 59, been correct, the freight train could have made
the run from Granger to Azusa ten minutes clear of passen-
ger train No. 3; that is, it would have had twenty-two min-
utes to make the run of six miles and clear the track for No.
3. But that train order stating that No. 3 would run one
hour and fifty minutes late was not correct. No. 3 left Green
River at 11:33 p. m., one hour and forty-three minutes late.

There is no telegraph station at Azusa. No. 3 passed Marston, a telegraph station 3 1-2 miles east of Azusa, at 1:50 p. m., one hour and forty minutes late. The collision took place about one mile west of Azusa at 12 o'clock midnight, on a straight track with an unobstructed view. The headlights of both engines were burning when they left their last stopping places. Plaintiff's intestate, who was an express messenger on No. 3, the engineer of that train, and the engineer, the fireman, conductor, and brakeman on the freight train, were killed. A verdict was rendered in favor of plaintiff, and the defendant appeals.

3. We have a statute (Sess. Laws 1903, p. 76, c. 92) which provides:

"All transitory causes of action arising without this state, in favor of nonresidents shall, if suit is brought thereon in this state, be brought and tried in the county where the principal defendant resides, or if the principal defendant is a corporation, then in the county where it has its principal place of business, subject, however, to the power of the court to change the place of trial as provided by law. All transitory causes of action arising without this state, in favor of residents of this state, shall, if suit is brought thereon in this state, be brought and tried in the county where such defendant resides, or in the county where the principal defendant resides, or if the principal defendant is a corporation, then in the county where such resident resides or in the county where such corporation has its principal place of business, subject, however, to a change of venue as provided by law."

The plaintiff alleged the residence of the defendant as being within the state, and the acts of negligence and the death of the deceased resulting therefrom as occurring in Wyoming. It was not alleged in the complaint that the plaintiff, the administrator, was a resident of Weber county, the place where the action was commenced. To this complaint the defendant filed a general demurrer for want of facts, and a special demurrer "that the court has not jurisdiction of the subject-matter of the action." The court sustained the demurrer, and permitted the plaintiff to amend by inserting in the complaint the allegation that the plaintiff, at all times mentioned in the complaint, was a resident of the county of Weber, state of Utah. The defendant then stipulated to enter

its appearance in the cause, and was given thirty days to plead. Thereafter it answered, admitting certain allegations of the complaint, denying others, and pleading the defenses of assumed risk, fellow servants, a general release, and that the cause of action as set forth in the complaint accrued, if at all, in the state of Wyoming; that the deceased at the time of the infliction of the injury and of his death was, and that his heirs at law were, residents of Wyoming, and that the defendant was and is a resident of the state of Utah, having its principal place of business in Salt Lake county. On plaintiff's motion, the court struck from the answer the defendant's allegations with respect to jurisdiction. Complaint is made of this ruling. By the defendant's filing its general demurrer for want of facts, stipulating its appearance in the cause, and answering to the merits, the court undoubtedly obtained jurisdiction of its person. We also are of the opinion that the court had jurisdiction of the subject-matter. In speaking of this statute, Mr. Justice Frick, in the case of *Farnsworth v. U. P. Coal Co.* (Utah), 89 Pac. 74, decided this term, observed:

"In view of the numerous decisions under statutes like the one in question, there can now remain no serious doubt that this and similar statutes are enacted for the benefit of the defendant merely, and do not affect the jurisdiction of the subject-matter, and therefore may be waived and are waived by filing a general demurrer to the complaint, since to do so constitutes a general appearance. The courts, with rare exceptions, have held that when a statute provides that suits shall be brought in the county where the defendant resides, or, if a corporation be sued, where it has its principal place of business, that it confers a privilege on the defendant merely which may be waived, and does not go to the jurisdiction of the subject-matter."

Under an act which provided that no civil suit should be brought against any person by any original process or proceeding in any other district than that whereof he is an inhabitant, it was held that the right to insist upon suit only in the one district is a personal privilege which may be waived and is waived by pleading to the merits. Mr. Justice Brewer said:

"Without multiplying authorities on this question, it is obvious that the party who in the first instance appears and pleads to the merits waives any right to challenge thereafter the jurisdiction of the court on the ground that the suit has been brought in the wrong district." St. L., etc., Ry. v. McBride, 141 U. S. 127, 11 Sup. Ct. 982, 35 L. Ed. 659, and cases there cited."

But a complete answer to the defendant's contention is that the suit, having been brought and tried in the county where the plaintiff, the administrator, resided, was properly brought in that county, and falls within the express provision of the statute. The statute of Wyoming (admitted in evidence) giving a right of action for the wrongful death of a person provides that "every such action shall be brought by and in the name of the personal representative of such deceased person." This court held that under such statute such an action can only be brought by the personal representative, and that it cannot be brought in the name of the heirs. (*Thorpe v. U. P. Coal,* 24 Utah 475, 68 Pac. 145; *In re Lowham's Estate* [Utah], 85 Pac. 445.) The administrator, so far as bringing the action, was the real party in interest. He was something more than a mere nominal or formal party. He was vested with the title to the subject of the litigation, even though it is destined to ultimately pass in due course to designated beneficiaries. It was he who had control of the action, and, so long as he faithfully discharged the duties of his trust, he was the only party to represent the interest which he prosecuted. (*Cincinnati, H. & D. R. Co. v. Thiebaud,* 114 Fed. 918, 52 C. C. A. 538.) As bearing upon the question, see, also, *Mexican, etc., R. R. Co. v. Eckman,* 187 U. S. 429, 23 Sup. Ct. 211, 47 L. Ed. 245; *Harper v. Railroad* (C. C.), 36 Fed. 102; *Bishop v. Railroad* (C. C.), 117 Fed. 771.

4. It is next claimed that the testimony given by the witness Lowham was the statement of a result of an experiment, and that before it was admissible it was essential to first show the similarity of conditions, and that the testimony of the witness Hammerson was opinion evidence, and was upon a subject on which the jury could as readily form a correct judgment as could the witness; that is to say, when the witness stated that the escaping steam from the engine ob-

scured his view of the track, and that it was necessary for him to go on the pilot in front of the engine to see the track in advance, the giving of such testimony was stating the result of an experiment, and that when the witness was asked what effect the escaping steam, on the particular engine in question, on the morning of the day of the accident when he was running and operating it, had in obscuring the view of the track, and as to whether the track could be seen because of the escaping steam, such question called for an opinion of the witness on a subject, which the jury could as readily and correctly form as the witness. These questions did not call for, nor did the answers partake of, such character of evidence. The questions asked and the answers made called for and were statements relating to what the witness observed with respect to the condition of the engine. The questions did not involve expert or opinion evidence, nor statements the knowledge of which was derived from mere experiments. Asking the witnesses as to what they saw and observed, and as to what effect the same had in obscuring the track or in preventing the headlight from being seen, no more called for opinion evidence than if the witness had been interrogated concerning any other obstruction which had a tendency to produce the same result. Quite true, a person in the ordinary walks of life might know that steam, if sufficiently condensed, was not translucent; so might he know that a tree is opaque, or that dense foliage obscures vision. But whether such things obstruct the line of vision from a particular point to a given place is ordinarily a question of fact. Cannot a witness state that foliage obscured vision, and prevented certain things from being seen? Must he be required to state to the jury the approximate number of leaves and twigs on the trees and shrubs, their relative position with reference to the line of vision, the place and the situation from which the particular thing or object is viewed and then let the jury draw the conclusion whether or not the foliage had the effect of obstructing the line of vision? Must here the witness, as is contended by appellant, state to the jury the pressure of steam and the condition of the weather with respect to cold from which its den-

sity and degree of opaqueness is to be ascertained, the quantity and the place or places from which it escaped, the situation of the engineer on the engine, the velocity and direction of currents of air; in other words, lay before the jury all the primary facts with respect to obscuring vision, and then let them draw the conclusion whether the escaping steam obscured the track from the view of the engineer, and whether the headlight could or could not be seen by those on an approaching train? What better way is there of accurately laying such facts before the jury than by the statements of those who were upon the engine, and who saw the escaping steam and observed its effect with respect to observing the track in advance of the engine?

5. The release pleaded by the defendant was admitted in evidence. Section 4, art. 10, and section 1, art. 19, of the Constitution of Wyoming, were also admitted in evidence, which read:

"No law shall be enacted limiting the amount of damages to be recovered for causing the injury or death of any person. Any contract or agreement with any employee waiving any right to recover damages for causing the injury or death of an employee shall be void."

"It shall be unlawful for any person, company or corporation, to require of its servants or employees as a condition of their employment, or otherwise, any contract or agreement, whereby such person, company or corporation shall be released or discharged from liability or responsibility, on account of personal injuries received by such servants or employees, while in the service of such person, company or corporation, by reason of the negligence of such person, company or corporation, or the agents or employees thereof, and such contracts shall be absolutely null and void."

In addition to the admission in the answer that the deceased was in the employ of the defendant, engaged in the handling of and caring for baggage, the evidence also shows that he was so in its employ, and for which services he was paid by the defendant. The contract on its face appears to have been signed at Salt Lake City, Utah. Because of the release, the appellant contends that the court erred in refusing its request to direct a verdict in its favor, and in refusing to charge, as requested by it, that, if the jury found the con-

tract of release was made as in the answer alleged, they should find a verdict for the defendant. The court in substance charged that if the jury found that the contract was intende1 to be partly performed, and at the time of the injury was being performed, in the state of Wyoming, and that the deceased was in the employ of the defendant as baggage agent and in the performance of his duties as such at the time of the injury, then the contract could not in any way affect the liability of the defendant, and did not operate as a release of the defendant from liability incurred through its negligence. The appellant contends that the release barred all right of recovery, in support of which we are cited to *Nor Pac. Ry. Co. v. Adams,* 192 U. S. 440, 24 Sup. Ct. 408, 48 L. Ed. 513 *Boering v. Chesapeake Beach Ry. Co.,* 193 U. S. 442, 24 Sup. Ct. 515, 48 L. Ed. 742, *Quimby v. Boston, etc., R. R.,* 150 Mass. 365, 23 N. E. 205, 5 L. R. A. 846, and *Muldoon v. Seattle Ry. Co.,* 7 Wash. 528, 35 Pac. 422, 22 L. R. A. 794, 38 Am. St. Rep. 901, where it was held that, if a passenger is injured or killed while riding on a pass gratuitously given and accepted by him with knowledge of the conditions therein contained releasing the company from ordinary negligence, the company is not liable in the absence of willful or wanton negligence; the *Express Cases,* 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 791, which were suits brought by certain express companies that had been doing business on certain railroads, and under special contracts between the respective companies, to compel the railroad companies to permit them to continue business on their roads on terms to be fixed by the courts, and where it was held that railroad companies are not required by usage or by common law to transport the traffic of independent express companies over their lines by furnishing to all independent express companies equal facilities for doing an express business upon their passenger trains, and that they were not obliged to do more as express carriers than to provide the public at large with reasonable express accommodations; *Baltimore & Oh. Ry. v. Voigt,* 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560, *Pittsburgh, etc., Ry. v. Mahony,* 148 Ind. 196, 46 N. E. 917,

*Railway Co. v. Keefer,* 44 N. E. 796, 146 Ind. 21, 38 L. R.
A. 93, 58 Am. St. Rep. 348, and *Peterson v. Chicago & N.
W. Ry. Co.,* 119 Wis. 197, 96 N. W. 532, 100 Am. St. Rep.
879, where it was held that a contract made by one who was
in the employ of an express company, and not of the railway
company exempting the railway company from injury whilst
in the course of his employment with the express company,
from ordinary negligence of the railway company or that of
its servants, was valid, and did not contravene public policy;
*Bates v. Old Colony R. Co.,* 147 Mass. 255, 17 N. E. 633,
where it was held that the privilege granted by a railroad com-
pany to an express messenger holding a passenger's season
ticket of riding in the baggage car where passengers were not
allowed to ride is a sufficient consideration for an agreement
by such messenger to absolve the railroad company from all
liability for accident or injury resulting therefrom, even if
caused by the company's servants. In the *Voigt Case* the
plaintiff, an express messenger, alleged in the complaint that
he was traveling as a passenger for hire on defendant's train.
The court recognized the established and settled rule of policy
that a common carrier of such a passenger cannot lawfully
stipulate for exemption from responsibility for the negligence
of himself or his servants, but held that no such relation ex-
isted between the plaintiff and the railroad company. There
it was held that plaintiff's occupation of the car, which was es-
pecially adapted to the uses of the express company, was not
in pursuance of any contract between him and the railroad
company, but was an incident of his permanent employment
by the express company. In the Indiana cases the general rule
was also recognized that a contract of release from the results
of negligence was void "when applied to exemption against
negligence in the discharge of a public or quasi public duty,
such as owing by a common carrier to the ordinary shipper,
passenger, or servant," but held that railway companies, al-
though public or common carriers, may contract as private
carriers, such as transporting express matter for express com-
panies, as such matter is usually carried, and in that capacity
may properly require exemption from liability for negligence

as a condition to the obligation of the carriage. But in none of the cited cases did the relation of master and servant exist between the railway company and the person injured or killed, and for whose injury damages were claimed; nor was such person in any particular performing duties or services for it. Here, by the admission in the pleadings, as well as by the evidence, it is shown that the deceased was not only an employee of the express company, but that he was also an employee of the defendant railway company. The relation of master and servant existed between him and the defendant. The decided weight of authority in this country sustains the proposition that a contract whereby an employee agrees in advance to relieve his employer from liability for injuries resulting from the latter's negligence, or that of his other employees, when he is by the law of the jurisdiction responsible for their negligence, is void as against public policy. (1 Page on Contracts, sec. 367; 20 A. & E. Enc. Law, 155; 1 Bailey's Mast. & Serv. sec. 1048; *Johnston v. Fargo,* 77 N. E. 388, 184 N. Y. 379; *Tarbell v. Rutland Rd.,* 73 Vt. 347, 51 Atl. 6; *Lake Shore, etc., R. R. v. Spangler,* 44 Ohio St. 471, 8 N. E. 467, 58 Am. Rep. 833; *Richmond Ry. Co. v. Jones,* 92 Ala. 218, 9 South. 276; *Little Rock & Ft. S. Ry. Co. v. Eubanks,* 48 Ark. 460, 3 S. W. 808, 3 Am. St. Rep. 245; *Blanton v. Dold,* 109 Mo. 64, 18 S. W. 1149; *Willis v. Railroad,* 62 Me. 488; *Johnson v. Richmond Railroad Co.,* 86 Va. 975, 11 S. E. 829; *Kansas Railroad Co. v. Peavy,* 29 Kan. 169, 44 Am. Rep. 630; *Roesner v. Hermann* [C. C.], 8 Fed. 782; *Chicago Coal Co. v. Peterson,* 39 Ill. App. 114.)

If the defendant could not have directly entered into a contract so as to relieve itself from the consequences of such negligence, it cannot avail itself of such a contract made for its benefit by some third party. If, so far as affecting it, the one is invalid, so must also be the other. Holding the contract void as against public policy, so far as applied to the relation of master and servant existing between the deceased and the defendant, and as attempting to limit the liability of the latter for its negligence resulting in injury to the former,

it is not essential to determine the question whether the contract requires construction under the laws of Utah, where it was apparently made, or Wyoming, where the injury was inflicted, and where at the time of his death the deceased was performing services for the defendant. It may, however, be observed that it is fairly inferable from all the facts and circumstances of the case sufficient to warrant a finding that, when the contract was entered into and when the deceased entered the service of the defendant, it was contemplated that part of the services and duties, both for the defendant and the express company, was to be rendered and performed in the state of Wyoming. In such view of the case, and the deceased at the time of the infliction of the injury being engaged in the performance of services for the defendant in Wyoming, the contract is to be deemed a contract of that state. So considering it, the contract is clearly void, because expressly forbidden by the laws of that state.

6. It is also urged by defendant that it was entitled to have a verdict directed in its favor on the ground that the negligence of fellow servants was the sole proximate cause of the collision and death. The evidence tended to show that train order No. 59 as sent out and transmitted by the train dispatcher to the local telegraph operators showed that passenger train No. 3 was 1 hour and 30 minutes late, but that the local telegraph operator at Granger negligently transcribed it so as to read "one hour fifty minutes" late, and so delivered it to the freight train crew. The evidence also tends to show that the order so delivered by the operator at Granger was the same order which had been delivered to the crew at Altamont, where it had been correctly transcribed and delivered to them. It is claimed by the appellant that the crew of the freight train was negligent in not discovering the discrepancy between the two orders, each numbered 59, and that under all the circumstances of the case, through the last order delivered to them had been correct, they nevertheless were negligent in attempting to make the run to Azusa. At the request of appellant, the court charged the jury that under the laws of Wyoming the members of the passenger train crew, the freight train

crew, and the local telegraph operator at Granger were fellow servants of the deceased, if the jury found that the deceased was in the employ of the defendant, and that the defendant was not liable for any injury inflicted upon the deceased through the negligence of any such servants; and that, if the jury found that the collision and death of the deceased were caused through the negligence of any such servants, then it was their duty to find a verdict for the defendant, unless they found by a preponderance of the evidence that the defendant was also guilty of negligence in failing to exercise ordinary care with respect to the alleged defective condition of the engine, and that such negligence was a proximate cause of the death of plaintiff's intestate. It is well-settled law that where an injury is the result of two concurring causes, and the master is responsible for or contributed to one of them, he is not exempt from liabilty because a fellow servant who is responsible for the other cause may also have been culpable. (*Jenkins v. Min. Co.,* 24 Utah 513, 68 Pac. 845; *Merrill v. O. S. L. R. R.,* 29 Utah, 264, 81 Pac. 85, 110 Am. St. Rep. 695.) This principle of law, of course, is not disputed by appellant; but the contention made by it is that the negligence of fellow servants, the telegraph operator at Granger and the members of the freight train crew, was the sole proximate cause of the collision and death. In other words, that the negligence of the defendant, if any there was, did not combine nor concur with the negligence of a fellow servant in producing the injury, nor was it a contributing cause thereof. That the evidence is sufficient to authorize a finding by the jury that the defendant was negligent in sending out on its road the engine in question must be conceded. Of course, before it could be made liable in resulting damages, such negligence must be a proximate cause of the injury. The defendant is not responsible for the results of negligence, except such as are natural, proximate, and direct. The general test as to whether negligence is a proximate cause of the accident is said to be whether it is such that a person of ordinary intelligence should have foreseen that an accident was liable to be produced thereby. But the test of liability is not wheth-

er, by the exercise of ordinary prudence, the defendant could or could not have foreseen the precise form in which the injury actually resulted, but he must be held for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act. If the act is one which the party, in the exercise of ordinary care, could have anticipated as likely to result in injury, then he is liable for any injury actually resulting from it, although he could not have anticipated the particular injury which did occur. (1 Thomp. Neg. [2d Ed.], secs. 50, 59; *Hill v. Winsor,* 118 Mass. 251; *A., T. & S. F. Railroad Co. v. Parry,* 67 Kan. 515, 73 Pac. 105; *Wallin v. Eastern Railroad Co. of Minn.,* 83 Minn. 149, 86 N. W. 76, 54 L. R. A. 481.

"The true rule is," said the Supreme Court of the United States, in *Railway Co. v. Kellogg,* 94 U. S. 469, 24 L. Ed. 256, "that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science, or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it." To the same effect are, 2 Labatt, Mast. & Serv., section 805; *Chicago, B. & Q. R. Co. v. Spirk,* 51 Neb. 167, 70 N. W. 926; *Wright v. Railroad,* 14 Utah 394, 46 Pac. 374; *Ewell v. Min. Co.,* 23 Utah 192, 64 Pac. 367; *Thompson v. Salt Lake Rapid Transit Co.,* 16 Utah 281, 52 Pac. 92, 40 L. R. A. 172, 67 Am. St. Rep. 621.

Tested by those principles, we think the question as to whether the defendant's negligence was a proximate cause of the injury was one of fact, which was properly submitted to the jury. The charged acts of negligence of the defendant were continuous and in operation up to the happening of the accident. From the evidence the jury might well have found that the defendant, in sending out the defective engine, in the exercise of ordinary care, ought to have anticipated that injury would naturally and likely result therefrom, and that it even ought to have anticipated the probable happening of an accident such as did happen. We cannot say as a matter of law that had it not been for the escaping steam on the freight engine which prevented the engineer from seeing the track in advance, and which so obscured the headlight as to prevent its being seen by those on an approaching train, the crews of the respective trains, on a straight track, with an

unobstructed view for six miles, would not have discovered the approaching trains in time sufficient to have avoided the collision. In a case where a plaintiff was injured by the derailment of a train of which he was the engineer from running into a partly open switch, the rails of which were turned by a fellow servant, and where it was claimed that the railway company was negligent in failing to have lights on the switch, and where it was urged that the turning of the switch rails by the fellow servant was the sole proximate cause of the injury, it was observed by the court:

"If the plaintiff's theory be true, the lights would have prevented any accident in the condition the switch was, as they would have warned plaintiff in time to avoid the danger, so that the negligence of the defendant in opening this closed switch for use without any lights to warn plaintiff of the presence of the switch or its danger was just as much the proximate cause of the injury as was the turning of the switch rails. And it certainly was a concurrent cause, and the injury, in any event, under the plaintiff's theory and evidence, was occasioned partly through the negligence of the defendant as to the switch lights and partly by the condition of the switch rails, in which case the defendant would be liable." (*Town v. Mich. Cent. Ry. Co.*, 84 Mich. 214, 47 N. W. 665. See, also, *Board of Com'rs. of Boone County v. Mutchler*, 36 N. E. 534, 137 Ind. 140; 2 Labatt, Mast. & Serv., section 813; *Grand Trunk Rd. v. Cummings*, 106 U. S. 700, 1 Sup. Ct. 493, 27 L. Ed. 266.)

No error being made to appear of record, the judgment of the court below must be affirmed, with costs. Such is the order.

McCARTY, C. J., and FRICK, J., concur.