*This opinion is subject to revision before final publication in the Pacific Reporter*

**2026 UT 5**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DEER VALLEY RESORT COMPANY,
*Appellant and Cross-appellee,*

*v.*

WILLIAM OLSON,
*Appellee and Cross-appellant,*

and

LARK PYPER,
*Appellee.*

No. 20240922
Heard September 5, 2025
Filed March 26, 2026*

On Appeal of Interlocutory Order

Third District Court, Summit County
The Honorable Richard E. Mrazik
No. 200500522

Attorneys*:

Adam Strachan, Kevin J. Simon, Park City,
for appellant and cross-appellee

Robert B. Sykes, C. Peter Sorensen, Salt Lake City,
for appellee and cross-appellant

---

* As of January 31, 2026, "The Supreme Court consists of seven justices." UTAH CODE § 78A-3-101(1). Pursuant to Utah Supreme Court Standing Order No. 18, this court sat and rendered judgment in this matter as a division of five justices.

* Additional attorneys: Brian A. Birenbach, Breckenridge, Colo., Meghan A. Sheridan, Salt Lake City, for *amicus curiae* National Ski Areas Association and Utah Ski and Snowboard Association, in support of appellant and cross-appellee.

Mark Taylor, Ryan Christensen, Salt Lake City, for appellee

———————

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE HAGEN,
ASSOCIATE CHIEF JUSTICE POHLMAN, and JUDGE NEIDER joined.

Due to his retirement, JUSTICE PEARCE did not participate herein;
DISTRICT COURT JUDGE CAMILLE L. NEIDER sat.

JUSTICE NIELSEN became a member of the Court after oral
argument in this matter and accordingly did not participate.

———————

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1    William Olson and Lark Pyper worked as lift operators at the Deer Valley Ski Resort during the 2019–2020 ski season. As part of their employment, Deer Valley required seasonal employees to sign a waiver releasing Deer Valley from liability for any injuries they might incur while participating in certain "activities" on Deer Valley property, even if the injury was caused by Deer Valley's negligence. In the release agreement, "activities" was defined to include many of the things an employee might do at the ski resort—whether on the job or off—from skiing and riding ski lifts to generally making use of restaurants, retail stores, and resort property. Deer Valley provided employees with a free ski pass, which the release agreement identified as the consideration for the employee signing the release. Both Olson and Pyper signed the release.

¶2    The ski season was cut short in March 2020 by the COVID-19 pandemic. Most Deer Valley employees, including Olson and Pyper, were laid off on March 15. Two days later, on St. Patrick's Day, Olson and Pyper went back to the resort to return their uniforms. While there, they learned that a few other terminated employees had organized a get-together on the mountain. They got a ride up the mountain from one of the few employees still working that day. The employee, Olson, and Pyper piled onto a Deer Valley-owned snowmobile and headed up the mountain. Unfortunately, they never made it to their destination. The employee lost control of the snowmobile and all three of them were thrown off. Both Olson and Pyper were seriously hurt.

¶3 They both sued Deer Valley. They alleged that Deer Valley was vicariously liable for the negligence of the employee and directly liable for its own negligence. Deer Valley moved for summary judgment, arguing that it was not vicariously liable for the employee's negligence because he was not acting within the course and scope of his employment when he gave Olson and Pyper the snowmobile ride. And it argued that it could not be held directly liable for its own negligence because Olson and Pyper had waived any such claim by signing the release agreement. The district court agreed that Deer Valley was not vicariously liable for the employee's negligence and dismissed Olson and Pyper's vicarious liability claims. But the court rejected Deer Valley's argument that the release agreement precluded the direct liability claims against it. The court relied on a 1907 case, *Pugmire v. Oregon Short Line Railroad Co.*, 92 P. 762 (Utah 1907), which held that an agreement between an employer and employee that waives the employer's liability for its own negligence is void as against public policy. Deer Valley petitioned for interlocutory review of that decision. And Olson petitioned for interlocutory review of the court's decision on his vicarious liability claims.

¶4 We affirm the district court's dismissal of Olson's vicarious liability claims because we agree that there was no evidence in the record from which a reasonable jury could find that the employee was acting within the course and scope of his employment when the employee drove Olson and Pyper up the mountain. But we reverse the court's decision on the direct liability claims, which was based entirely on *Pugmire*. We conclude that *Pugmire* must be confined to its facts, which involved work-related injuries to an employee. Thus, we do not extend *Pugmire* to the circumstances here, where two former employees were injured outside of work. Accordingly, we reverse the district court's decision as to the Plaintiffs' direct liability claims, and we remand for the district court to consider any remaining arguments about the application of the release agreement in this case.

## BACKGROUND[1]

¶5 Deer Valley hired William Olson and Lark Pyper as ski lift operators for the 2019–2020 winter season. Deer Valley required all

---

[1] In reviewing a summary judgment decision, "we view the facts and all reasonable inferences in the light most favorable to the
(continued . . .)

seasonal employees to sign a waiver titled "Release of Liability, Waiver of Claims, Warning, Assumption of Risk and Indemnity Agreement" (release agreement, release, or agreement). The agreement released Deer Valley from liability for any injuries sustained by an employee while participating in "activities" at the ski resort, including injuries caused by Deer Valley's negligence. "Activities" was defined to include, among other things, skiing; riding ski lifts; and generally using resort property, restaurants, rental equipment, sidewalks, stairways, and parking lots. As consideration for the waiver, Deer Valley gave employees a free ski pass that allowed them to ski at Deer Valley and several other resorts while they were off duty. During the onboarding process, both Olson and Pyper signed the release agreements and Deer Valley issued them free ski passes.

¶6    The 2019–2020 ski season ended abruptly due to the COVID-19 pandemic. In March 2020, Deer Valley closed the resort and laid off nearly all its staff, including Olson and Pyper.

¶7    Two days after being laid off, Olson and Pyper came back to the resort to return their uniforms. While there, they discovered that some of their former coworkers were hosting a St. Patrick's Day party on the mountain. Olson and Pyper got a ride on a Deer Valley-owned snowmobile from one of the few Deer Valley employees who had not yet been laid off. Earlier that day, this employee had safely driven another group of recently-terminated employees to the meeting point. But while driving Olson and Pyper, he took an unfamiliar shortcut and lost control of the snowmobile. The group crashed, and Olson and Pyper were seriously injured.

¶8    Both Olson and Pyper sued Deer Valley to recover damages for their injuries. Their cases were assigned to the same judge, who ordered joint discovery.

¶9    During discovery, the parties deposed the employee. Because both Plaintiffs had asserted claims that Deer Valley should be held vicariously liable for the employee's negligence, an important topic during the deposition was whether the employee had been acting within the scope of his employment when he gave Olson and Pyper the snowmobile ride.

---

nonmoving party." *UMIA Ins., Inc. v. Saltz*, 2022 UT 21, ¶ 65, 515 P.3d 406 (cleaned up). We state the facts accordingly.

¶10 The employee testified that during the 2019–2020 ski season, he was one of four "mountain supervisors" and was responsible for between thirty to fifty employees at any given time. He did not directly supervise Olson or Pyper, but he thought they were "loyal," "good employees," and "hard workers."

¶11 As part of his job, the employee was authorized to drive a company snowmobile. He said that he used the snowmobile "very little" during the ski season. But when he did, "the purpose of the snowmobile . . . was to transport employees or to take guests up at the end of the day if they'[d] missed their lift."

¶12 On the day of the accident, he was on duty and was wearing his Deer Valley uniform. He didn't yet know that most of his coworkers, including Olson and Pyper, had been laid off. But he did know that "people were upset" about the ski season ending early due to the pandemic. And he agreed that keeping up employee morale was related to his work.

¶13 When asked why he gave Olson and Pyper a ride that day, the following exchange took place:

> Q. So just in your own words . . . what are the reasons why you did it?
>
> A. *They're my friends* and
>
> Q. Coworkers?
>
> A. Coworkers, and I consider them my friends.
>
> . . .
>
> Q. What's that?
>
> A. I consider them my friends. Not real close friends but they're my coworkers. You know, we're compatible. We got along. *I just wanted to help them out.* They asked me for a ride and I gave them one.
>
> Q. Any other reasons?
>
> A. No.

(Emphases added.)

¶14 Olson's counsel continued to press the employee as to why he provided the ride, and the employee added to his answer:

> Q. As a mountain supervisor, if someone had asked you . . . should we invite [Olson and Pyper]

back next year, what would your response have
been?

A. Yes.

Q. Because they were good employees?

A. They're good employees and they know what
they're doing.

Q. Competent?

A. Yes, very much.

. . .

Q. Very much so. Okay. So are those the reasons
you took them up the hill?

. . .

A. Yes.

Q. Any other reasons you took them up?

. . .

A. Yeah, they just wanted to go up, so I took them
up. I trusted them. I knew that they know what
they're doing.

¶15   The employee went on to testify that he knew giving Olson
and Pyper a ride was "leaving his job duties" and against Deer
Valley policy. When asked if he would have given the ride if his
supervisors had been watching him, he said he would not have
because "it's a no-no. It's breaking resort policy." He
acknowledged, "I didn't want to get caught towing my friends up
because I'm leaving my job duties," and that "I knew I was doing
something against resort policy and basically just trying to help
some friends out."

¶16   After the conclusion of discovery, Deer Valley moved for
summary judgment. As to the Plaintiffs' vicarious liability claims,
Deer Valley argued that it was not vicariously liable for the
employee's negligence because the employee had not been acting
within the course and scope of his employment when he gave the
Plaintiffs a ride and crashed the snowmobile. The district court
agreed, stating that the Plaintiffs had not "provide[d] a non-
speculative basis by which a jury could reasonably find that [the
employee] was motivated, at least in part, by the purpose of serving
Deer Valley's interests . . . when he shuttled [the Plaintiffs] up the

hill on that day." Accordingly, the district court dismissed the vicarious liability claims against Deer Valley.[2]

¶17 With respect to the direct negligence claims, Deer Valley argued that the Plaintiffs had waived any claims they might have had when they signed the release agreements. The district court rejected this argument based on this court's holding in *Pugmire v. Oregon Short Line Railroad Co.*, 92 P. 762 (Utah 1907), that an agreement between an employer and an employee waiving liability is "void [as] . . . against public policy." (Quoting *id.* at 765). Accordingly, the court refused to dismiss Olson and Pyper's negligence claims against Deer Valley.

¶18 Deer Valley petitioned this court for interlocutory review of the district court's refusal to dismiss the direct liability claims against it. And Olson petitioned for interlocutory review of the district court's grant of summary judgment on his vicarious liability claims. We granted the petitions and consolidated the appeals.

¶19 We have jurisdiction under Utah Code section 78A-3-102(4)(a)(vi).

## STANDARD OF REVIEW

¶20 "When reviewing a district court's summary judgment ruling, we review the court's legal conclusions and ultimate grant or denial of summary judgment for correctness." *Huitron v. Kaye*, 2022 UT 36, ¶ 15, 517 P.3d 399 (cleaned up).

## ANALYSIS

¶21 We first address the district court's dismissal of Olson's vicarious liability claims. We agree with the court that there was no evidence creating a genuine dispute of fact that the employee was acting within the scope of his employment when he gave the Plaintiffs a ride on the snowmobile. So, we conclude the court's dismissal of the claims was correct.

---

[2] In the record, the court expressed concern that we might not "care" about the reasoning underlying its decision and that we "may not even read the transcript" of its oral ruling. That concern is misplaced. It is our regular practice to carefully consider the reasoning supporting the rulings we review, whether found in written orders or relevant transcripts. A district court's explanation of its ruling meaningfully assists the appellate process.

¶22 We then move to the district court's rejection of Deer Valley's argument that the Plaintiffs' direct liability claims fail because of the release agreements they signed. The district court rested its ruling on the holding of *Pugmire v. Oregon Short Line Railroad Co.*, 92 P. 762 (Utah 1907), which stated broadly that an agreement between an employer and employee that waives the employer's liability for its own negligence is void as against public policy. But we conclude that *Pugmire*'s holding cannot be extended to the facts here. Accordingly, we reverse the district court's denial of Deer Valley's summary judgment motion on this basis and remand for the court to consider any remaining arguments related to the application of the release agreements.

## I. VICARIOUS LIABILITY

¶23 Olson claims that the employee was negligent, and that Deer Valley should be held vicariously liable for his negligence under the doctrine of *respondeat superior*. The district court ruled otherwise, and we agree with the court's decision.

¶24 Under the common law doctrine of *respondeat superior*, an employer can be held responsible for an employee's torts. *Burton v. Chen*, 2023 UT 14, ¶ 15, 532 P.3d 1005. This doctrine promotes "fairness to injured parties" because an employer is more likely than an employee to be able to satisfy a judgment and is better positioned to insure against liability. *M.J. v. Wisan*, 2016 UT 13, ¶¶ 50–51, 371 P.3d 21. *Respondeat superior* also aims to incentivize employers to hire, train, and monitor employees in a way that reduces tortious conduct. *See id.* ¶ 51.

¶25 Under this doctrine, we have recognized that "an employer should be liable for an employee's actions that occur within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." *Burton*, 2023 UT 14, ¶ 15 (cleaned up). In contrast, if the tort occurs when an employee is engaging in "an independent course of conduct," the employer is not liable. *M.J.*, 2016 UT 13, ¶ 52 (quoting RESTATEMENT (THIRD) OF AGENCY § 7.07(2) (A.L.I. 2006)).

¶26 Thus, to determine whether Deer Valley could be held vicariously liable for any negligent conduct of the employee, we must decide whether there are facts from which a jury could reasonably conclude that the employee was acting within the course and scope of his employment. To guide that analysis, our caselaw articulates two relevant questions. First, we ask "whether

the agent's conduct is of the general kind the agent is employed to perform." *Burton*, 2023 UT 14, ¶ 16 (cleaned up). And second, we ask "whether the agent's acts were motivated, at least in part, by the purpose of serving the principal's interest." *Id.* (cleaned up). The answer to both questions must be "yes" for a plaintiff to establish vicarious liability.

¶27   With respect to these inquiries, the district court concluded that Olson had identified facts sufficient to withstand summary judgment on the first question, but had failed to create a "non-speculative" dispute of fact as to the second question. We agree with the district court's conclusion.

¶28   First, there is a genuine dispute of fact as to whether the employee's conduct that day—giving Olson and Pyper a ride on the snowmobile—was of the general kind he was employed to perform for Deer Valley. The employee stated that he used the snowmobile "very little" during the ski season. But "the purpose of the snowmobile, when [he] used it, was to transport employees or to take guests up at the end of the day if they'[d] missed their lift." Thus, while it wasn't the primary activity he did on the job, there were times when he gave employees rides on a company snowmobile. At the summary judgment stage, this is sufficient to create a dispute of fact as to whether this conduct was of the kind he performed for Deer Valley, at least on occasion.

¶29   However, we conclude that there is not a genuine dispute of fact as to the second inquiry—whether the employee was acting, at least in part, to serve Deer Valley's interests. During his deposition, the employee was asked numerous questions about his reasons for giving Plaintiffs a ride to the gathering on the mountain. He explained that it was because "they're [his] friends" and he "just wanted to help them out." When asked if there were any other reasons why he gave them a ride he answered in the negative.

¶30 Olson points to other portions of the employee's deposition that he contends show the employee was at least partly motivated to serve Deer Valley's interest. The employee said he believed that "people were upset" about the ski season ending early due to COVID-19, and he agreed that maintaining employee morale was related to his work. He also testified that Olson and Pyper were "competent" employees and "hard workers." He said he would have "invite[d] them back next year" to work because "[t]hey're good employees and they [knew] what they're doing." He agreed that their competency was one of the reasons he gave

them a ride and added, "Yeah, they just wanted to go up, so I took them up. I trusted them. I knew that they know what they're doing." From this, Plaintiffs argue that an inference can be drawn that the employee drove Olson and Pyper to the gathering to "keep up morale, maintain goodwill toward [Deer Valley], and ensure [employee] retention."

¶31 But we agree with the district court that this evidence does not create a genuine dispute of fact as to whether the employee was trying to serve Deer Valley's interests, rather than just helping his friends. Throughout the deposition, the employee consistently maintained that he gave the Plaintiffs a ride because they were friends and he "just wanted to help them out."

¶32 True, he agreed with Olson's counsel's statements that Plaintiffs were competent employees and that employee morale was important. But the employee never indicated that he thought giving his coworkers a ride up the mountain would improve morale or convince Plaintiffs to come back to work for Deer Valley the following year. In fact, he admitted that he knew what he was doing was "against resort policy." Yet he drove them anyway because he was "just trying to help some friends out."

¶33 We agree with the district court that there is no "non-speculative basis by which a jury could reasonably find that [the employee] was motivated, at least in part, by the purpose of serving Deer Valley's interests." For this reason, Deer Valley cannot be held vicariously liable for the employee's negligence under the doctrine of *respondeat superior*.

¶34 We now turn to Plaintiffs' direct liability claims against Deer Valley.

## II. DIRECT LIABILITY AND *PUGMIRE*

¶35 Both Plaintiffs have brought claims alleging that Deer Valley is directly liable for their injuries because it negligently hired, trained, supervised, retained, and entrusted a vehicle to its employee. In its motion for summary judgment in the district court, Deer Valley argued that Plaintiffs had waived any negligence claims against it when they signed the release agreement. The district court denied the motion based on *Pugmire v. Oregon Short Line Railroad Co.*, 92 P. 762 (Utah 1907). Deer Valley argues that *Pugmire* does not control here. We agree.

¶36 In *Pugmire*, William Pugmire was hired by the Oregon Short Line Railroad Company to manage one of its "outfit, or hotel,

cars." *Id.* at 763. To fulfill his role, Mr. Pugmire was required to supply a cook. *Id.* at 764–65. The railroad approved his wife, Christine Pugmire, to serve as the cook and to live in the outfit car with him. *Id.* As a condition of the couple's employment, they were required to sign a release waiving "any and all rights they might otherwise have to sue [the railroad] and recover for damages on account of any injury . . . during the continuance of such employment and residence on said cars." *Id.* at 763.

¶37 Unfortunately, Mrs. Pugmire was seriously injured when an engine car crashed into the outfit car. *Id.* The Pugmires sued the railroad for negligence and won a favorable jury verdict. *Id.* at 764. On appeal, the railroad pointed to the waiver the couple had signed and argued it prevented any recovery. *Id.* at 765. This court concluded that Mrs. Pugmire could recover because the release was void, holding:

> The law is well settled that a master cannot, by contract in advance, absolve himself from liability (which would exist if no contract were made) for injuries to his servant caused by the master's own negligence. The ground upon which such contracts are held to be void is that they are against public policy.

*Id.*

¶38 However, beyond this, the *Pugmire* court did not offer additional analysis or explain the scope of its holding. It is not clear whether its holding applies only to releases of liability between employers and employees for injuries sustained while working, or whether it applies more broadly to such releases of liability for injuries sustained at any time.

¶39 And that distinction matters in this case, because if we interpret *Pugmire* as applying to releases for work-related injuries only, it has no application here. After all, the parties agree that Plaintiffs' injuries are not work related. Plaintiffs had been terminated by Deer Valley two days prior, and they were making their way to a gathering with friends on their personal time. But if we interpret *Pugmire* as applying to all releases of liability between employers and employees, regardless of when the injury occurs, then it would apply.

¶40 Although the scant analysis in *Pugmire* does not provide us with a clear answer to that question, it does leave hints that its

holding applies to releases of liability between employers and employees for only work-related injuries. The opinion does not describe Mrs. Pugmire as cooking during the accident, but it does appear that the *Pugmire* court viewed her as having been engaged in her employment when she was injured. Specifically, it explained that at the time of the accident, she "was rightfully in the car *doing work for the defendant.*" *Id.* at 765 (emphasis added). Further, the two cases on which *Pugmire* relied for its holding were cases where the plaintiffs were working at the time they were injured. *See id.* (citing *Stone v. Union Pac. R.R. Co.*, 89 P. 715, 716 (Utah 1907) (describing injury to employee incurred while he was "rendering services for [his employer] in the handling of and caring for baggage of passengers carried and transported by the defendant"); *Lake Shore & Mich. S. Ry. Co. v. Spangler*, 8 N.E. 467, 469–70 (Ohio 1886) (describing injury to a brakeman caused by the negligence of the train's conductor)).

¶41   Given these clues and the lack of analysis suggesting that *Pugmire* could apply outside the workplace, we conclude that *Pugmire*'s holding must be confined to the facts of that case— releases of liability between employers and employees for work-related injuries.[3] And for that reason, we conclude it does not apply here.

¶42   Accordingly, we reverse the district court's denial of Deer Valley's motion for summary judgment, for which it relied exclusively on *Pugmire*. And we remand for the court to consider any remaining arguments related to that motion.

---

[3] We note that *Pugmire* was issued before the Workers Compensation Act was enacted. *See* Industrial Commission of Utah, ch. 100, 1917 Utah Laws 306 (current version located at UTAH CODE §§ 34A-2-101 to -1005). So it may have been superseded entirely by that statute. *See Graham v. Albertson's LLC*, 2020 UT 15, ¶¶ 13–14, 462 P.3d 367 (explaining that a statute can explicitly preempt existing common law with "a clear expression of [legislative] intent" or implicitly preempt the common law "in two ways: (i) the statute's regulatory scheme is so pervasive that the common law doctrine can no longer function, or (ii) the statute is in irreconcilable conflict with the common law" (cleaned up)). However, that issue is not before us, so we do not address it further.

**CONCLUSION**

¶43 We conclude that the district court correctly determined that Deer Valley is not vicariously liable for its employee's negligence as a matter of law, and we affirm the district court's dismissal of Olson's vicarious liability claims. However, we reverse the district court's denial of Deer Valley's motion for summary judgment as to Plaintiffs' direct liability claims against Deer Valley. And we remand for the court to consider any remaining arguments related to that motion.

———————